UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARCIA TRAIL, on behalf of MICHAEL
TRAIL,

                              Plaintiff,

        -against-                                              5:13-CV-0014 (LEK)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.
_____

## MEMORANDUM-DECISION and ORDER

### I.    INTRODUCTION

        This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 16 ("Plaintiff's Brief"); 18 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is affirmed.

### II.   BACKGROUND

        On or about August 6 or 7, 1997, Plaintiff, then thirty years old, was injured while at his job

as a food server at the Trump Taj Mahal Hotel/Casino, which caused the initial onset of lower back

pain.  Dkt. No. 12 ("Record") at 583.  The pain was severe and radiated into his lower left leg.  Id.

        Due to the amount of time that has elapsed from the time of Plaintiff's initial injury to

present, an extensive medical, administrative, and court record has accumulated.  The following lays

out a compressed, comprehensive sequence of events detailing Plaintiff's medical history, hearing

before an administrative law judge ("ALJ"), and the ALJ's decision.

### A. Plaintiff's Medical Records

Approximately one week after the initial incident, Plaintiff went to the Atlantic City Medical Center emergency department with complaints of severe lower back pain. <u>Id.</u> at 277. Plaintiff was first referred to Dr. Zabinski, an orthopedist, who performed routine examinations, prescribed medication, and ordered an MRI. <u>Id.</u> While under the care of Dr. Zabinski, Plaintiff started physical therapy, which he attended several times weekly but ultimately did not facilitate improvement in his pain. <u>Id.</u> at 277, 583. An MRI of the lumbar spine conducted January 5, 1998, revealed that Plaintiff was suffering from a protrusion of the L5-S1 disc on his left side, which caused a displacement of a traversing nerve root sleeve—in other words, a herniated disk. <u>Id.</u> at 563.

Plaintiff was next evaluated by Dr. Greenwood, a neurosurgeon, whom Plaintiff saw on several occasions the same year. <u>Id.</u> at 278, 583. In August 1998, Dr. Greenwood advised Plaintiff against any type of heavy lifting and discussed surgery to alleviate the persistent pain. <u>Id.</u> at 278, 583.

Plaintiff consulted Dr. Strenger, a neurosurgeon, on or about September 2, 1998, to discuss the best surgical options to alleviate his pain. In Dr. Strenger's opinion, the best option was a microendoscopic discectomy at L5-S1. <u>Id.</u> at 584. Plaintiff understood and wished to proceed with surgery. <u>Id.</u> at 585. Plaintiff was admitted to Atlantic City Medical Center for the procedure on September 8, 1998. <u>Id.</u> at 575-76. After his surgery, Plaintiff returned to Strenger for a re-evaluation of his pain. <u>Id.</u> at 586. It was reported that Plaintiff's preoperative leg pain was "almost completely resolved," and that he experienced only intermittent aches when sitting. <u>Id.</u> A further examination also revealed that all muscle groups moved well and reflexes were symmetrical. <u>Id.</u>

Subsequent follow-up appointments indicated a steady improvement, though Plaintiff still experienced some intermittent lower back pain that worsened over the course of a day. Id. at 587. Dr. Strenger put Plaintiff in a physical therapy program that allowed him to resume light work and handle weights of between five to ten pounds. Id. In November of the same year, Plaintiff had no lower back pain at the current time and denied any weakness, even with aching sensations in his calf and foot. Id. at 588. After this evaluation, Dr. Strenger recommended that Plaintiff continue the when he returned to work as a waiter part-time. Id. Plaintiff's return to work resulted in a progressive increase in his lower back pain, despite no accident or injurious incident. Id. at 589.

By December of the same year, Dr. Strenger had prescribed Relafen, before changing to Flexeril, for Plaintiff's pain and ordered a follow-up MRI. Id. at 589-90. An MRI showed no evidence of recurrent disk herniation or new disk herniation at other levels, but showed disk desiccation predominately at the L5-S1 level. Id. at 598. Dr. Strenger ordered a trial period of lumbar epidural steroid injections to help alleviate the pain. Id.

Dr. Braccia, a pain medicine doctor and anesthesiologist, also examined Plaintiff in August of 1999. He stated that Plaintiff's discomfort was "suggestive" of recurrent lumbar radiculopathy, and agreed that epidural steroid injections were the best course of treatment at the time. Id. at 601. At the evaluation following the first injection procedure, Plaintiff reported one day of relief before the pain returned. Id. at 604. Dr. Braccia observed that Plaintiff's lower back pain was "constant," but most exacerbated by sitting. Id. Moving forward, Dr. Braccia advised a lumbar provocative discography at L3-L4, L4-L5, and L5-S1, to which Plaintiff was amenable. Id. However, workers' compensation would not cover the payment for this surgery or for ongoing medical treatment. Id. at 612. As a result, Plaintiff's surgery was delayed for approximately a year and a half. Id. at 617,

3

619. Dr. Strenger prescribed a combination of medications to Plaintiff to attempt to alleviate the pain in the absence of the procedure. Id. at 614. It was not until January 9, 2001, that Dr. Braccia was able to schedule the provocative discogram for later that month. Id. at 619. At that point, Plaintiff's last evaluation had been in late July of 2000. Id. Between periods of examination, Plaintiff reported that he continued to experience lower back pain that was exacerbated by prolonged sitting, and that he felt sharp, low pain when leaning forward, but had no peroneal numbness or weakness in his lower extremities. Id. Plaintiff underwent the provocative discogram on January 31, 2001, where injections at the L3-L4, L4-L5, and L5-S1 intervertebral discs were performed. Id. at 622.

In March of the same year, Plaintiff was re-evaluated by Dr. Strenger, who scheduled another high resolution image to follow up on the 1999 MRI before making a decision on whether further surgery was necessary. Id. at 623. Upon study of the MRI, Dr. Strenger found postoperative changes on the left at L5-S1 with an element of facet hypertrophy. Id. at 624. There was, however, no evidence of recurrent disc herniation, and all disc levels above the L5-S1 level had good disc signals. Id. Dr. Strenger recommended surgical intervention by performing a posterior lumbar fusion and instrumented transverse process arthrodesis at L5-S1; Plaintiff agreed. Id. at 624, 626. Surgery was performed on or about May 18, 2001. Id. at 634. Post operative follow-up evaluations with a neurosurgeon, Dr. Glass, showed a diminishment in Plaintiff's lower back pain, but it was still present. Id. at 631-32.

In or around late November and early December, Plaintiff relocated to South Carolina and began care under Dr. Giddens, an orthopedic surgeon who specializes in neurological surgery. Id. at 636, 643, 656. At the initial examination, Dr. Giddens reported that Plaintiff had tense, rigid

muscles but ambulated well.  Id. at 656.  Dr. Giddens advised Plaintiff that he should pursue another

career path that would not be as physically demanding.  Id.  Plaintiff returned for a second visit with

continued pain in the lower back.  Id. at 657.  He described his pain as worse when switching from a

sitting to a standing position.  Id.  Plaintiff also informed Dr. Giddens that the physical therapy was

not of "significant" benefit.  Id.  Dr. Giddens suggested an MRI as a next step, which showed what

appeared to be "adequate decompression, [and] good placement of the rods and screws at L5-S1."

Id. at 657, 660.  It was again reported that Plaintiff's "only real problem" was when he bent over and

straightened back up; otherwise, pain was minimal.  Id.  Additionally, a CT/myelogram performed

in October of the same year revealed no significant compressive pathology nor any appearance of a

solid bony fusion.  Id. at 665.

Dr. Giddens next saw Plaintiff in October 2002.  Id. at 665.  Dr. Giddens reported that

Plaintiff would need continued pain management.  Id.  In February 2003, Dr. Giddens reported that

Plaintiff was receiving "immediate and complete pain relief" from treatments performed by Dr.

Sauer, an osteopathic physician, who specializes in pain management.  Id. at 666.  However,

Plaintiff still experienced pain and difficulty when moving from a sitting to standing position.  Id.

Dr. Giddens believed that "conservative measures" were no longer effective in improving Plaintiff's

pain, and that, as a result, it was reasonable to explore an additional surgery.  Id. at 670.  At the

same time, Dr. Giddens felt that Plaintiff was "suited only for sedentary type [of] work."  Id.

However, Dr. Giddens was skeptical of even this type of work due to Plaintiff's "requirement" of

narcotics for medication.  Id.

Dr. Giddens referred Plaintiff to Dr. Sauer for pain management, who first examined

Plaintiff on January 22, 2002.  Id. at 639.  Dr. Sauer wrote a report similar to Dr. Giddens as to

Plaintiff's medical history, stating that Plaintiff's "pain is intermittent in that it only occurs if he goes from a bent over to a standing position." Id. Dr. Sauer planned to begin Plaintiff on a course of caudal epidural steroid injections, but Plaintiff noticed no improvement from the initial injection. Id. at 639-40. A second injection yielded similar unsuccessful results. Id. at 641-42. A third injection was to be performed, but if it resulted in no relief then Dr. Sauer was to begin injections into the facet joints themselves. Id. at 642. Dr. Sauer noted on Plaintiff's May 16, 2002, reevaluation that the previous visit's injection produced "almost 100% improvement in his pain, which almost lasted one month." Id. at 644. Repeat facet injections were conducted due to the "excellent relief" they produced. Id. at 645. Unfortunately, even with the success of the injections the pain began to slowly return to Plaintiff's back. Id. at 646-47. Dr. Sauer planned on performing radiofrequency neurolysis of the L4-L5 medial branch in addition to the contributing branch from L3-L4 laterally. Id. at 647. This procedure did not relieve Plaintiff's pain. Id. at 648. Throughout most of Plaintiff's course of injections, Dr. Sauer had placed him on Roxicodone, which gave Plaintiff about 75% pain relief. Id. Pain management physician Dr. Wenz felt that Plaintiff should continue on his medications since they produced no side effects and offered relief from pain. Id.

On August 26, 2002, Plaintiff was re-evaluated by Dr. Sauer. Id. at 649. At this appointment, Plaintiff asked to return to facet joint injections since they had helped him with pain in the past. Id. In October, Dr. Sauer noted that the facet joint injections provided relief and Plaintiff's pain was reported as tolerable due to medication. Id. at 650. The following month, Plaintiff requested the injections because they helped him, but was not sure if they were actually helping with his pain. Id. at 651. In December, Dr. Sauer reported that Plaintiff requested the injections before traveling for the holidays since they did provide him with significant relief. Id. at 653. This

injection relieved 90% of Plaintiff's pain for at least a two-week period. Id. at 654.

In early January, Dr. Sauer noted that it was unlikely, even though injections and medications made the pain tolerable, that Plaintiff would ever be able to get his pain 100% under control. Id. Dr. Sauer stated that Plaintiff "is going to need continued pain management, conceivably for the rest of his life." Id. at 681. From February 2003 to January 2004, Plaintiff's visits to Dr. Sauer yielded the same results. Id. at 676-80. Plaintiff maintained his medication regime and received facet joint injections as needed. Id. at 676-80. Plaintiff's last visit to Dr. Sauer was in July 2004. Id. at 157. It was again reported that Plaintiff obtained relief from the injections, and reduced his pain to a more manageable state with medication, but he still suffered from chronic lower back pain and lumbar facet joint syndrome. Id. Dr. Sauer halted treatment after learning of Plaintiff's alleged doctor shopping for narcotic medications. Id. at 156.

In December 2003, an independent medical evaluation was conducted by Dr. Delasotta, a neurological surgeon, who believed Plaintiff had reached his maximum medical improvement, and that there was a low likelihood that he would get much better given that his symptoms had showed chronic patterns of improvement and deterioration. Id. at 272-76. A second, independent evaluation was done at the request of Plaintiff's attorney by Dr. Tobias, a general surgeon, in November 2004. Id. at 277. Dr. Tobias reported that there was a restriction of function and lessening to a material degree of working ability. Id. at 281. Additionally, he opined that Plaintiff had a permanent orthopedic disability of 85% of partial total. Id.

**B. ALJ Hearing**

On October 27, 2006, Plaintiff filed for disability insurance benefits for a fifth time,[1] alleging disability resulting primarily from injury to his back from an onset date of August 23, 1999. Id. at 36-37.  After the SSA denied Plaintiff's application on March 29, 2007, Plaintiff requested a hearing before an ALJ.  Id. at 22.  On April 30, 2009, ALJ Marie Greener conducted a hearing regarding Plaintiff's claim for Social Security Title II benefits.  Id. at 36, 84-88.

ALJ Greener presented Plaintiff with questions to determine his work capabilities, present medical state, and activities of daily life.  Id. at 43-45, 47-49, 51-53.  Plaintiff testified that the last time he was fully employed was a three-week period a few summers prior to the ALJ hearing.  Id. at 43.  Plaintiff testified that his back condition had only deteriorated over the years, and that he has been unable to work comfortably without having to move around and change positions.  Id. at 45. When asked about improvements to his condition, Plaintiff stated, "it just always hurts."  Id. at 48. The ALJ then focused her questions on Plaintiff's activities of daily life, asking him to provide a "snapshot" of a regular day.  Id. at 51.  On a typical day, Plaintiff stated he goes to the clinic, exercises, makes numerous walks to his sister's home across town, and performs household chores. Id. at 51-52.  Plaintiff testified that he used to go fishing as a hobby, but has since refrained due to medical conditions unrelated to his back.  Id. at 53.

Following the ALJ's questions, Plaintiff's attorney further explored Plaintiff's functional capacity and past work.  Id. at 54-56, 60-62.  The attorney asked about Plaintiff's ability to sit, stand, lift, carry, and push and pull.  Id. at 54-57.  Plaintiff testified that his abilities had diminished

---

[1] Transcripts of the hearing before ALJ Marie Greener refer to the second, third, and fourth filings along with their respective determinations.

in all aspects due to his injury.  Id.  On average, he was able to sit or stand for a total of twenty

minutes before having to change positions or move around.  Id. at 54-55.  Similar limitations

applied to his daily walks.  Id. at 55.  Plaintiff was able to lift one gallon of milk, or its equivalent,

in each arm and carry it for a short period of time.  Id.  Pushing and pulling capabilities were

limited, and Plaintiff further stated that his pain was the most bothersome when he moved his body

from one position to another.  Id. at 56.  In the four years prior to his employment at the Taj Mahal,

Plaintiff worked as a car assistant manager, a service writer, and a waiter/food server.  Id. at 60-61.

Plaintiff's attorney inquired about the amount of sitting, standing, lifting, and carrying involved with

each job.  Id. at 60-62.  Plaintiff testified to each having substantial amounts of either standing or

sitting time, and as part of both the service writer's job and dealership position, Plaintiff would

occasionally lift items of fifty to sixty pounds.  Id. at 60-62.

### C. Procedural History

After the hearing, the ALJ issued a decision on June 19, 2009.  Id. at 22-33.  The ALJ found

that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability,

August 23, 1999, through date last insured, December 31, 2004.  Id. at 24.  The ALJ determined that

while Plaintiff had the severe impairment of lumbar spine disorder, Plaintiff did not have an

impairment or combination of impairments that met or medically equaled a listed impairment in 20

C.F.R. § 404(P), Appendix I.  Id. at 24-26.  Listing 1.04 of the Appendix was considered, but there

was no evidence of "motor loss, sensory or reflect loss, positive seated and supine straight-leg

raising tests, or an inability to ambulate effectively."  Id. at 26.  The ALJ further found that Plaintiff

had the residual functional capacity ("RFC") to perform sedentary work, but "could [only] lift

and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours in an 8-

hour day, sit 6 hours in an 8-hour day, push and/or pull without limitation beyond that listed for lifting/carrying, and occasionally stoop, crouch, and crawl." Id. at 30-31.

Given Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff was able to perform the full range of sedentary work. Id. at 32. "Sedentary work requires, at most, occasional stopping, and 'some' limitations in climbing and balancing are not significant." Id. Therefore, the ALJ concluded that Plaintiff was not under a disability by the standards set forth in the Social Security Act. Id. at 32-33.

Plaintiff filed a request for review on June 23, 2009. Id. at 12. On September 25, 2009, the ALJ's decision became the final decision of the Commissioner of the SSA ("Commissioner") when the Appeals Council denied the request for review. Id. at 1. Plaintiff timely filed an appeal on January 4, 2013. Dkt. No. 1 ("Complaint").

## III.   LEGAL STANDARD

### A.  Standard of Review

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if her decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision-maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "'even if it might justifiably have reached a different result upon a de novo review.'" Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of

Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).  However, the Court should not uphold the ALJ's decision when there is substantial evidence, but it is not clear that the ALJ applied the correct legal standards.  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  An individual seeking disability benefits "'need not be completely helpless or unable to function.'"  De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process.  20 C.F.R. § 404.1520(a)(1).  In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).  If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends.  20 C.F.R. § 404.1520(a)(4).  Otherwise, the SSA will proceed to the next step.  Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity."  Id. § 404.1520(a)(4)(i).  If it does, the claimant is not disabled under SSA standards.  Id.  At step two, the SSA considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509.  Id. § 404.1520(a)(4)(ii).  If she does not

have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the

SSA considers the severity of the claimant's medically determinable physical or mental

impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20

C.F.R. § 404(P), Appendix I. Id. at § 404.1520(a)(4)(iii). If it does not, the SSA moves on to step

four to review the claimant's RFC and past relevant work. Id. at § 404.1520(a)(4)(iv). The claimant

is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant

work. Id. If the claimant cannot perform her past relevant work, the SSA decides at step five

whether adjustments can be made to allow the claimant to work somewhere in a different capacity.

Id. at § 404.1520(a)(4)(iv). If appropriate work does not exist, then the SSA considers the claimant

to be disabled. Id.

## IV.    DISCUSSION

Plaintiff argues that: (1) the ALJ failed to properly evaluate the opinion of his treating

physician, Dr. Giddens; (2) the ALJ afforded inadequate weight to his examining physician, Dr.

Tobias (3) the ALJ's determination of Plaintiff's credibility is unsupported by substantial evidence;

and (4) the ALJ's Step Five determination is unsupported by substantial evidence. Pl.'s Br. at 1.

### A. The Treating Physician Rule

The SSA defines a treating physician or source as an "acceptable medical source who

provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an

ongoing treatment relationship with you[,] . . . [which is established by you seeing, or having seen],

the source with a frequency consistent with accepted medical practice for the type of treatment

and/or evaluation required for your medication condition(s)." 20 C.F.R. § 404.1502.

District courts in the Second Circuit have interpreted a "treating" physician to be one "who

has provided the individual with medical treatment or evaluation and who has or had an ongoing

treatment and physician-patient relationship with the individual." Gray v. Astrue, No. 06-CV-0456,

2009 WL 790942, at *7 (N.D.N.Y. Mar. 20, 2009) (quoting Coty v. Sullivan, 793 F.Supp. 83, 85-86

(S.D.N.Y. 1992)). The treating physician rule entitles a physician's opinion to "controlling weight"

if it is determined that it is "well-supported" and is consistent with substantial evidence found

through "medically acceptable clinical and laboratory diagnostic techniques." Harrison v. Colvin,

No. 13-CV-835, 2014 U.S. Dist. LEXIS 135399, at *40 (N.D.N.Y. May 20, 2014).

While it is the Commissioner who determines whether the claimant is disabled, the ALJ

must consider the treating physician's opinion. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

According to SSA guidelines, an ALJ will assess every medical opinion she receives. 20 C.F.R.

§ 404.1527(c)(2). If a treating physician's opinion contradicts substantial evidence in the record

provided by other medical experts, it will not be afforded controlling weight and must be

individually assessed to determine its weight. Id. In the ALJ's decision, she must provide "good

reasons" for the weight she assigns to a treating physician's opinion. Id.

If the treating physician does not receive controlling weight, the ALJ is required to explain

why, considering:

> (i) the frequency of examination and the length, nature and extent of the treatment
> relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the
> consistency of the opinion with the record as a whole; (iv) whether the opinion is from
> a specialist; and (v) other factors brought to the Social Security Administration's
> attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32; see also 20 C.F.R. § 404.1527(c)(2). The Second Circuit has stated that

courts should "not hesitate to remand" if the ALJ does not include these explanations. Halloran,

362 F.3d at 33; see also Ryan v. Astrue, 650 F. Supp. 2d 207, 212 (N.D.N.Y. 2009) (Kahn, J.).

Courts may also be required to remand if an ALJ does not include "good reasons" in her decision for discounting the treating physician's opinion. Walsh v. Colvin, No. 12-CV-00933, 2014 WL 1239117, at *10 (N.D.N.Y. Mar. 25, 2014) (citations omitted).

Here, the rule is triggered because Plaintiff sought treatment or evaluation from multiple physicians, who each offered objective medical opinions as to Plaintiff's RFC.

The ALJ was correct in addressing Dr. Giddens' opinion in her decision because he meets the requirements of a treating physician as a doctor and "has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." Gray, 2009 WL 790942, at *7. Additionally, the ALJ was correct in addressing the treatment and evaluations of Dr. Sauer as a treating physician with whom Plaintiff visited on many occasions for pain management. R. at 157-186, 637-655.

The SSA guidelines dictate that more weight should be given to a source who has treated a plaintiff more frequently and for a longer period of time. 20 C.F.R. § 404.1527(c)(2)(i). Here, Plaintiff saw Dr. Giddens approximately eleven times over a two and a half year period, whereas he saw Dr. Sauer approximately twenty-six times over a similar time period. R. at 157-86, 270-71, 637-71. As such, it was proper for the ALJ to have afforded the opinions of Dr. Sauer greater weight than those of Dr. Giddens. In her decision, the ALJ references multiple pain management treatment sessions and their effectiveness on Plaintiff's pain, and although it is not directly stated, these sessions are attributable to Dr. Sauer. Id. at 28-29. Dr. Sauer's pain management reports provide objective medical evidence of Plaintiff's condition that does not contradict certain evaluations or opinions made by Dr. Giddens. Id. For instance, in early 2002, both physicians stated that Plaintiff's pain occurs mainly when transitioning from a bent position to a standing

14

position.  Id. at 28.  Otherwise "he did not have a lot of pain" and merely experienced "discomfort."

Id.  Again, in mid-2003 and early 2004, Dr. Sauer noted Plaintiff's symptoms were "essentially

unremarkable," that he had "no sensory or motor deficits," and there appeared to be "no evidence of

impairment."  Id. at 29.  These findings are consistent with Dr. Giddens' overall evaluation in 2003

that stated Plaintiff was "suited for only sedentary type work."  Id.  Whether Dr. Giddens'

evaluation was or was not "speculative" because of Plaintiff's drug use, his opinion was consistent

with not only Dr. Sauer's opinion, but also with numerous other state medical consultants that

helped guide the ALJ to her final RFC determination.  Id. at 26-31.  At least five of the state medical

consultants referenced in the ALJ's decision concluded that Plaintiff was less limited than the ALJ's

own RFC determination, which could indicate that she took into account Dr. Giddens' skepticism

that "even sedentary work [may be] beyond the scope of what [Plaintiff] could do," even if she

ultimately discounted this hypothesis.  Id. at 29.  Thus, the ALJ properly assigned weight to the

opinions of Dr. Giddens and Dr. Sauer.

As for Dr. Tobias, Plaintiff saw him on a single occasion and he is therefore not considered a

treating physician, but rather a "consulting physician."  Id. at 277-282.  Tobias himself stated that

"no doctor/patient relationship exist[ed]."  Id. at 282.  "The treating physician rule does not apply to

consulting doctors," and the ALJ does not have to provide the same "good reasons" evidence for not

crediting a consulting doctor with sufficient weight.  Harrison, 2014 U.S. Dist. Lexis 135399, at

*52; Limpert v. Apfel, No. 97-CV-3581, 1998 WL 812569, at *6 (E.D.N.Y. May 27, 2008).  When

the ALJ determines the weight to afford a consulting physician's opinion, she must consider the

"thoroughness of the underlying medical examination and the degree of light the opinion sheds on

the conflicting assessment of the treating physician."  Harrison, 2014 U.S. Dist. LEXIS 135399, at

*52 (citing Gray, 2009 WL 790942, at *10-11).

Here, Dr. Tobias simply went through Plaintiff's work and medical history—which she considered "unremarkable"—and conducted her own examination.[2] R. at 277-82. Dr. Tobias determined that Plaintiff suffered from lumbar discogenic syndrome and, as a result, had "lessening to a material degree of working ability . . . [and] interference with . . . perform[ing] his daily activities of daily living." Id. In sum, Dr. Tobias concluded that the injuries sustained by Plaintiff while working at the Taj Mahal resulted in a permanent disability of "eighty-five percent of partial total." Id. In determining the weight and credibility of this medical opinion, the ALJ perceived the determination to be "questionable" due to the circumstances under which the report was produced; it was "solicited and paid for" by Plaintiff's counsel. Id. at 30. Although the ALJ was not required to provide "good reasons" for not crediting Dr. Tobias's opinion with sufficient weight, her skepticism of the validity of the diagnoses and observance of contradictions with past treatment notes appear to be sufficient justifications for the final weight credited to the opinion. Id.

Therefore, Plaintiff's assertion that Dr. Tobias's opinion was accorded inadequate weight is without merit.

**B. Credibility Determination**

Pursuant to 20 C.F.R. § 404.1529, the ALJ must evaluate a claimant's credibility as part of her disability determination. The factors ALJ Greener considered in determining Plaintiff not disabled were Plaintiff's representation of his symptoms and findings by treating and non-treating

---

[2] A physician also will not be considered a "treating physician" or "an acceptable medical source" if it can be determined that the "[claimant's] relationship with the source is not based on . . . medical need for treatment or evaluation, but solely on [a] need to obtain a report in support of your claim for disability." 20 C.F.R. § 404.1502.

16

sources. R. at 26-31. She concluded that Plaintiff's statements pertaining to the intensity,

persistence, and limiting effects of his injury were not entirely credible. Id. at 31. According to the

ALJ, Plaintiff's claims about his symptoms were "not supported by [the] limited number of positive

objective medical findings, his reported improvement with medication and injections, or the

majority of the opinions of record." Id. Plaintiff now claims that the ALJ's credibility

determination was unsupported by substantial evidence and was a misapplication of the appropriate

legal standards. Pl.'s Br. at 22.

 Where the ALJ's credibility finding "necessarily contributed to the ALJ's ultimate RFC

determination," the Court is required to review it. Fallon v. Colvin, No. 11-CV-1339, 2014 WL

61244, at *5 (N.D.N.Y. 2014) (Kahn, J.). Although the ALJ's credibility assessment receives

deference, Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005), it still must

be supported by substantial evidence, Walsh, 2014 WL 1239117, at *17. An unfavorable credibility

finding must include a clear explanation and specific reasons so a reviewing court can determine

with confidence whether the decision's reasoning is supported by substantial evidence. Norman v.

Astrue, 912 F. Supp. 2d 33, 43 (S.D.N.Y. 2012) (citing Urena-Perez v. Astrue, No. 06 Civ. 2589,

2009 WL 1726217, at *40 (S.D.N.Y. Jan. 6, 2009)); see also Nelson v. Astrue, No. 09-CV-00909,

2010 WL 35522304, at *7 (N.D.N.Y. Aug. 12, 2010) (Kahn, J.).

 The ALJ is required to evaluate a claimant's subjective complaints for credibility under a

two-step test. Barringer, 358 F. Supp. 2d at 81; see also 20 C.F.R. § 404.1529(c)(1). At step one,

the ALJ determines whether the medical evidence reveals that a claimant has "a medically

determinable impairment(s) that could reasonably be expected to produce [the claimant's]

symptoms." 20 C.F.R. § 404.1529(c)(1); Barringer, 358 F. Supp. 2d at 81. If it does, the ALJ

proceeds to step two and "evaluates the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent . . . [to which they] limit the claimant's capacity to work." Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r, No. 01 CV 0899, 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003)); see also 20 C.F.R. § 404.1529(c)(1). In addition to the objective medical evidence, the ALJ is also instructed to consider the following only when "the alleged symptoms suggest that the impairment is greater than what is demonstrated by the objective medical evidence": the plaintiff's daily activities; the location, duration, frequency, and intensity of the plaintiff's pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of the plaintiff's medication; other forms of treatment the plaintiff has received; measures the plaintiff has taken to relieve her symptoms; and other factors relating to the plaintiff's pain-induced functional limitations and restrictions. Barringer, 358 F. Supp. 2d at 81-82; 20 C.F.R. § 404.1529(c)(i)-(vii). These steps help ensure that the credibility finding is consistent with the objective medical evidence. See Walsh, 2014 WL 1239117, at *17 (quoting Williams ex rel. Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988)).

The ALJ in this case considered both components of the two-part test in her decision. First, the ALJ found the evidence supported her finding "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. at 31. Second, she found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible," for his statements were not supported by: (1) objective medical findings; (2) the improvements from prescribed medication and injections; (3) Plaintiff's stated activities of daily living; or (4) the sum of the medical opinions. Id.

The ALJ's credibility determination is supported by substantial evidence. In support of her

decision, the ALJ referenced Plaintiff's pain management appointments, medications taken, treatments received, activities of daily life, and Plaintiff's actual testimony from the hearing regarding his pain and limitations from his injury. Id. at 26-31. Over the course of his treatment, Plaintiff experience tolerable pain and, on occasion, complete relief with certain treatments and medications. Id. at 27-28. A significant reason for the Court to afford the ALJ deference as to credibility is that "the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing." Peryea v. Comm'r of Soc. Sec., No. 13 Civ. 0173, 2014 WL 4105296, at *6 (N.D.N.Y. July 15, 2014) (quoting Bomeisl v. Apfel, No. 96 Civ. 9718, 1998 WL 430547, at *6 (S.D.N.Y. July 30, 1998)). The ALJ listened to, observed, and analyzed Plaintiff's testimony to relevant credibility issues at the hearing, and relied on them as such in her decision.

The ALJ addressed Plaintiff's statements regarding his ability to conduct daily activities. At the hearing, Plaintiff testified he could not stand and/or walk more than ten to twenty minutes at a time; needed to stand after ten to twenty minutes of sitting; was able to lift and/or carry no more than approximately ten pounds in each arm; had pain with pulling but not so with pushing; and only had pain "if he went from a bent over to a standing position." R. at 26-28, 52, 54-56. Amidst Plaintiff's stated pain and limitations, the ALJ also probed and considered a "snapshot" of Plaintiff's daily activities in her decision. Id. 27. The ALJ took into account Plaintiff's daily exercise walks, doing dishes daily, cleaning, and grocery shopping where Plaintiff's mother only helps often and to the extent of assisting in packaging and freezing for later use. Id. at 52-53. Additionally, the ALJ addressed Plaintiff's hobbies. Id. at 53. Plaintiff stated that he was an avid fisher but has been prevented from doing so recently due to medical issues pertaining to his heart, not back. Id. The ALJ sufficiently surmised that Plaintiff was "still fishing" at the time his

disability benefits concluded.  Id. at 27.  Considering both Plaintiff's testimony as to his limitations but also his capabilities, it is within the ALJ's discretion to balance all relevant factors in making her determination.

Here, the ALJ, in evaluating Plaintiff's symptoms, determined they were not causing such an impairment as to overcast the objective medical evidence of Plaintiff's injury, and were therefore afforded appropriate weight.  In finding less than total credibility, the ALJ based her reasoning, specifically, on the inconsistencies between Plaintiff's statements and multiple medical findings, improvements with treatments and medications, and his ability to perform a range of daily activities. Id. at 31.  The ALJ provided clear and specific reasons for her credibility determination, which the Court finds is supported by substantial evidence.

Following the arguments above, the Court finds that the ALJ did not err in her credibility determination.

### C.  Step Five Determination

Additionally, because the ALJ properly considered the medical evidence, the Step 5 determination was supported by substantial evidence.  The ALJ had an adequate basis when determining whether jobs exist "in significant numbers in the national economy that claimant could have performed," considering his "residual functional capacity, age, education, and work experience."  Id. at 32.  Both treating physicians, Dr. Giddens and Dr. Sauer, opined that Plaintiff could maintain a level of sedentary type work, and the ALJ further determined that Plaintiff's "occasional postural limitations did not significantly erode his potential occupational base for sedentary work."  Id. at 29, 32.  Therefore, the ALJ's step five determination is supported by substantial medical evidence.

## V.  CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED:          January 15, 2015
                Albany, New York


Lawrence E. Kahn
U.S. District Judge